**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ANTHONY SCHMITT, individually and on behalf of all others similarly situated,

Plaintiff,

v.

ACCUWEATHER, INC.,

Defendant.

Case No. 4:26-CV-3383

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Anthony Schmitt ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's undersigned counsel, brings this Class Action Complaint against Defendant AccuWeather, Inc. ("AccuWeather" or "Defendant"). Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## NATURE OF THE ACTION

1. The unauthorized collection and disclosure of a person's search and browsing activity, website interactions, personal identifiers, and device identifiers strikes at the most basic expectation of privacy in one's online life. The misconduct is especially egregious where, as here, a company affirmatively represents to users that they may control whether their data is sold, shared, or tracked, then secretly sells, shares, and tracks that data anyway.

2. AccuWeather, Inc. owns, operates, and controls the website located at https://www.accuweather.com/ (the "Website"), through which it provides weather forecasts, current conditions, severe weather alerts, radar and mapping features, climate information, and other weather-related content and services to consumers nationwide.

3. Like many modern websites, the Website displays a data privacy banner (the "Privacy Banner") and a cookie preferences interface (the "Cookie Settings") purporting to give users meaningful control over what data the Website shares with third parties.

4. Defendant's assurances are false. The Website begins placing and transmitting cookies and other third-party tracking technologies, including the TTD Pixel, the Yahoo DSP, DoubleClick, and the ScorecardResearch web tags (the "Tracking Tools") capable of transmitting users' data the moment users visit the Website, before they can interact with the Privacy Banner or select their preferences in the Cookie Settings. The Tracking Tools transmit users' data to the companies that designed and operate them: The Trade Desk, Yahoo, Google, and ScorecardResearch (collectively, the "Tracking Entities").

5. Moreover, users, including Plaintiff, were misled by Defendant's Privacy Banner and Cookie Settings. The Website purports to let users manage their cookie preferences through the Cookie Settings. Specifically, users may click

"Customize Settings" in the Privacy Banner to access the Cookie Settings and: (1) click "Reject All" or (2) toggle off "Targeted Advertising." Yet even after users affirmatively reject all "Targeted Advertising" cookies in the Cookie Settings, the Website continues to deploy the Tracking Tools. The Cookie Settings informed users that they could disable cookies from The Trade Desk, Yahoo, and Google, and continued to place and utilize those cookies after users rejected them.

6. The Tracking Tools collect detailed interaction and behavioral data, including users' selections of links, buttons, forms, and other on-page elements, as well as information entered into search fields. This data includes: webpages viewed; inferred interests, preferences, age, location, and other characteristics based on users' behavior and content engagement; personal, device, and technical identifiers such as device type, operating system, and browser type; persistent identifiers, often contained within "cookies," that enable recognition of users across sessions and websites on the internet utilizing the same Tracking Tools; personal identifiers that associate users with individual profiles; and approximate geolocation information derived from IP addresses or similar signals. Collectively, this information is referred to herein as "Sensitive Information."

7. By misrepresenting both the effectiveness of its tracking mechanism and users' ability to decline consent, Defendant deprives users of any real control over their Sensitive Information and their privacy.

8. Accordingly, Defendant violated the federal Wiretap Act, 18 U.S.C. § 2510, *et seq.*; California's Invasion of Privacy Act ("CIPA"), including Cal. Penal Code § 631 (illegal wiretapping); Article I, Section 1 of the California Constitution; and common law, including intrusion upon seclusion, fraud and deceit, and unjust enrichment. Plaintiff brings this action individually and on behalf of a putative class of similarly situated persons harmed by Defendant's deceptive and unlawful surveillance practices.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e). This Court has supplemental jurisdiction over the non-federal claims in this action. This Court also has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is more than 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

10. This Court has personal jurisdiction over Defendant because Defendant is incorporated in Pennsylvania and maintains its principal place of business in State College, Pennsylvania.

11. Venue is proper in this Court because Defendant's principal place of business is located in this District and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

12. Plaintiff Anthony Schmitt is, and at all relevant times has been, a citizen of the State of California. Plaintiff accessed and used Defendant's Website while physically located in California.

13. Defendant AccuWeather, Inc. is a Pennsylvania corporation with its principal place of business at 385 Science Park Road, State College, Pennsylvania 16803. Defendant owns, operates, and controls the Website.

## FACTUAL ALLEGATIONS

### I. Plaintiff's Experience On The Website

14. Plaintiff last visited the Website from California in or around October 2026. During that visit, Plaintiff looked up the forecasts for San Diego, Miami, and Rome, checked current conditions and any active weather advisories, and bookmarked the San Diego page. Plaintiff does not have an account on the Website.

15. In connection with Plaintiff's visits to Defendant's Website, Plaintiff was presented with Defendant's Privacy Banner and rejected cookies in the Cookie Settings. Plaintiff reasonably believed that, having rejected cookies, and absent any affirmative consent to tracking technologies, Plaintiff's browsing activity would not

be tracked beyond what was strictly necessary for the Website's basic functionality. Despite Plaintiff's lack of consent to tracking, Defendant deployed the TTD Pixel, the Yahoo DSP, DoubleClick, and the ScorecardResearch web tags, which intercepted, recorded, and transmitted Plaintiff's browsing activity, device identifiers, and related metadata to The Trade Desk, Yahoo, Google, and ScorecardResearch. Had Plaintiff known that Defendant would deploy the TTD Pixel, the Yahoo DSP, DoubleClick, and the ScorecardResearch web tags and disclose Plaintiff's information to third parties despite Plaintiff's rejection of non-necessary cookies, Plaintiff would not have continued to use the Website.

## II. How Websites Function

16. Websites are hosted on servers, meaning their files are stored on and accessed from those servers. Websites are, in part, "run" on a user's internet browser, as the browser loads and processes the website's code to display the webpage.

17. When a user navigates to a webpage by entering a URL directly or clicking a hyperlink, that user's browser contacts a DNS (Domain Name System) server, which translates the website's web address into a unique IP (Internet Protocol) address.[1]

[1] *See How the Web Works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Nov. 12, 2026).

18. An IP address is "a unique address that identifies a device on the internet or a local network."[2]

19. When a user's browser navigates to a webpage, it sends an HTTP request to the server identified by that IP address (the "Request URL").

20. The Request URL includes a domain name and path, which identify the specific content being accessed and its location within the website's structure. The Request URL typically contains parameters, values appended to a URL to transmit data to the recipient, prefaced by a question mark to signal their use, which direct the web server to provide additional, context-sensitive content.

21. By viewing a URL, an ordinary person can read these parameters and determine what choices a user made on a website, including the products or articles viewed, the phrases searched, and the substance of the user's communications with the website.

22. Website owners and web developers write and manage the URLs for their websites.

23. After the Request URL is sent and the server responds, the user's browser assembles the packets sent by the server back into the HTML code of the webpage. That code is processed by the browser as it arrives and rendered into the

---

[2] *What is an IP Address – Definition and Explanation*, KASPERSKY, https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited Nov. 12, 2026).

visual display according to the HTML's instructions, the visible, and usually interactive, website that most people think of.

24. To provide more complex functionality, website developers embed commands written in other programming languages, such as JavaScript, within the HTML documents.[3]

25. Such code is used, among other things, to monitor and report users' activity. This code intercepts users' communications while they are in transit to a website, while a URL is being requested, and duplicates those requests, transmitting them to a first- or third-party server.

26. In short, the Internet relies on a constant, real-time exchange of requests and responses between a user's browser and a website's stored code and data. Critically, these requests and responses provide a near-complete record of everything a user does, and does not do, on a website, when and how they do it, and with what software and hardware.

## III. Defendant Programmed the Website To Identify and Track Users

27. Defendant voluntarily integrated Tracking Tools from the Tracking Entities into its Website's programming. Defendant's use of such Tracking Tools on its Website is performed pursuant to commercial agreements between Defendant

---

[3] *See JavaScript: Adding Interactivity*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/JavaScript_basics (last visited Nov. 12, 2026).

and the Tracking Entities. These commercial agreements are formed to provide a commercial benefit to both Defendant and the Tracking Entities.

28. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website's server to a user's web browser and stored locally on the user's device. Cookies typically contain unique identifiers that enable a website to recognize and differentiate individual users. These cookie files are automatically transmitted back to web servers through HTTP requests, allowing the Website and Tracking Entities to identify the device making the request and to record a session reflecting how the user interacts with the Website, i.e., everything they view, click on, type, search for, or even hover over.

29. First-party cookies are those placed directly on the user's device by the web server with which the user is knowingly communicating, in this case, Defendant's Website. First-party cookies are commonly used to recognize users across repeated visits to the same website and to track their on-site activity.

30. Third-party cookies are placed by domains other than the Website's domain, such as advertising or analytics domains. These third-party cookies contain unique identifiers that allow Tracking Entities to recognize and track individual users across different websites, including the Website, and across multiple browsing sessions.

31. As detailed further below, Tracking Tools, including first- and third-party cookies, that are placed on users' devices during interactions with the Website are subsequently used to intercept and record users' communications by the Tracking Entities, enabling them to surreptitiously track and collect Website users' Sensitive Information in real time.

32. Tracking Tools serve numerous commercial purposes, including: (i) analytics, such as measuring user engagement and Website performance; (ii) personalization, including remembering users' preferences; (iii) advertising and targeting, including delivering targeted or behavioral advertisements based on users' profiles; and (iv) social media integration.

33. The Tracking Entities use the collected Sensitive Information from users, such as Plaintiff, to build detailed marketing profiles of users to enhance the effectiveness and efficiency of Tracking Entities' and Defendant's marketing efforts.

34. Because Defendant controls the Website's software code and determines which Tracking Tools are loaded onto users' browsers, Defendant has control over whether these Tracking Tools are placed and whether users' Sensitive Information is transmitted to Tracking Entities.

## IV. The Website Misrepresented That Users Could Control the Collection and Disclosure of Their Sensitive Information

35. Defendant displayed a Privacy Banner and Cookie Settings on the Website. The Privacy Banner and Cookie Settings represented that users could make material choices about what tools were used on the Website and how their data was shared with third parties. Plaintiff relied on these representations in using the Website. However, these representations were materially false and misleading.

36. When users visited the Website, the Website immediately displayed a Privacy Banner stating: "Welcome! We're glad you're here and want you to know that we respect your privacy and your right to control how we collect, use, and share your personal data. Please read our Privacy Policy to learn about our privacy practices." The Privacy Banner provided users with options to click "Accept" or "Customize Settings" to manage their cookie preferences.




*Figure 1 – The cookie banner on the Website*

37. Website users who selected the "Customize Settings" option were presented with the Cookie Settings, which represented that users could control how their Sensitive Information was collected and shared by rejecting advertising cookies. The Cookie Settings offered the ability to click "Reject All" or "Accept All," listed "Analytics" and "Essential Services" cookies, and allowed users to toggle off "Targeted Advertising" cookies and click the "Accept" button.




*Figure 2 – The Cookie Settings interface on the Website*

38. The Cookie Settings further represent that "Analytics" cookies are used to analyze visitor data and market to them:

> Analytics
> Collection and analysis of personal data to further our business goals; for example, analysis of behavior of website visitors, creation of target lists for marketing and sales, and measurement of advertising performance.

39. The Cookie Settings further represent that "Essential Services" cookies are used to support and enable essential functionality on the Website:

> Essential Services
> Collection and processing of personal data to enable functionality that is essential to providing our services, including security activities, debugging, authentication, and fraud prevention, as well as contacting you with information related to products/services you have used or purchased; we may set essential cookies or other trackers for these purposes.

40. The Cookie Settings further represent that "Targeted Advertising" cookies are used to serve advertising content:

> Targeted Advertising
> Creation and activation of advertisements based on a profile informed by the collection and analysis of behavioral and personal characteristics; we may set cookies or other trackers for this purpose.

41. Specifically, the Cookie Settings promised that users could disable the use of the TDID cookie from The Trade Desk, the A3 cookie from Yahoo, and the IDE cookie from Google when users rejected "Targeted Advertising" cookies.




*Figure 3 – The Trade Desk TDID Cookie on Targeted Advertising cookie details*




*Figure 4 – The A3 Cookie from Yahoo on Targeted Advertising cookie details*




*Figure 5 – The IDE cookie from Google on Targeted Advertising cookie details*

42. The representations made by Defendant in the Privacy Banner and Cookie Settings led Plaintiff, and would reasonably lead all Website users similarly situated, to believe that they had disabled "Targeted Advertising" cookies via their express rejection. The Privacy Banner and Cookie Settings further reasonably led Plaintiff and all reasonable users to believe that Defendant would not allow Tracking Entities through cookies to access users' Sensitive Information for targeted advertising. Plaintiff acted on those representations by interacting with the Website after making privacy selections intended to reject any sharing of Plaintiff's personal information and use of any Tracking Tools for targeted advertising.

43. However, Defendant did not abide by Plaintiff's or users' expressed preferences. When users choose "Reject All" or turn off "Targeted Advertising" in the Cookie Settings, they clearly communicate that they do not consent to the placement or transmission of cookies other than those required for functionality. Nevertheless, Defendant continued to cause the TTD Pixel, the Yahoo DSP, DoubleClick, and the ScorecardResearch web tags, including cookies, to be placed or otherwise accessed on users' browsers and devices so that The Trade Desk, Yahoo, Google, and ScorecardResearch could intercept, transmit, and use users' Sensitive Information in real time.

## V. Defendant's Website Uses Tracking Tools

44. Defendant operates the Website and has installed Tracking Tools on the Website created by Tracking Entities. These Tracking Tools operate invisibly, tracking Website users' activity surreptitiously by intercepting users' Sensitive Information in real time as it arrives at or is sent from users' devices, copying the contents of those communications, and generating new Request URLs that are transmitted to the Tracking Entities.

45. Generally, the Tracking Tools function by intercepting users' communications, including Plaintiff's Sensitive Information, in transit when they take certain actions on the Website. These actions include when they click on a link, make a search, view a video, or load any page on the Website.

46. The Tracking Tools use cookies and other identifiers to identify users, including Plaintiff, when they visit the Website, including users who never made an account on the Website. The cookies allow the Tracking Entities to identify users, including Plaintiff, when they visit the Website or any other website where the Tracking Tools are present.

47. The Tracking Tools allow Defendant and the Tracking Entities to materially benefit from Plaintiff's Sensitive Information. Defendant uses Plaintiff's Sensitive Information to improve its marketing and advertising, while the Tracking Entities use Plaintiff's Sensitive Information for marketing and advertising on the

Website and other third-party websites, to improve their own services, including enhancing the algorithms used to build their Tracking Tools, and to build personal profiles to advertise to users, including Plaintiff.

## VI. The Trade Desk Pixel

48. The Trade Desk is a demand-side platform ("DSP"), meaning it provides automation software to assist advertisers in purchasing advertisements.[4] The Trade Desk provides advertisement purchasers with software tools to manage, analyze, and optimize digital advertising campaigns across multiple channels and inventory sources.[5] As a DSP, The Trade Desk works with supply-side platforms ("SSPs"), which are used to manage the supply of advertising inventory for publishers and other entities that sell advertising space on their websites.[6] The Trade Desk is "integrate[d] with many SSPs that rely on the advertising spend generated from The Trade Desk's advertisers."[7]

---

[4] *See What Is a Demand-side Platform (DSP)*, ADJUST, https://www.adjust.com/glossary/demand-side-platform/ (last visited Nov. 12, 2026).

[5] *See About Us*, THETRADEDESK, https://www.thetradedesk.com/about-us (last visited Nov. 12, 2026).

[6] *See What Is a Supply-Side Platform?*, PUBLIFT, https://www.publift.com/adteach/what-is-a-supply-side-platform (last visited Nov. 12, 2026).

[7] Trey Titone, *The Trade Desk OpenPath and The Future of SSPs*, AD TECH EXPLAINED (Feb. 21, 2022) https://www.adtechexplained.com/p/the-trade-desk-open-path-explained/ (last visited Nov. 3, 2026).

49. As to personalized advertisements delivered to users, Jeff Green, Chief Executive Officer of The Trade Desk, described The Trade Desk's Unified ID 2.0 marketing technology as follows: "[w]e will have effectively solved the identity matching challenge of the entire open internet on a scale well beyond anything cookies have ever accomplished, and all while providing consumers with much greater control over their privacy."[8]

50. Among the tracking technologies offered by The Trade Desk and employed by the Website for tracking user behavior and collecting data for targeted advertising is the Trade Desk Universal Pixel ("TTD Pixel").[9] The TTD Pixel is enabled by placing TTD Pixel code within a website's code, which enables the capture of data on each page of the website and across multiple websites.[10] The Trade Desk's TTD Pixel is designed to collect and transmit user data that marketers use to measure, manage, and optimize programmatic advertising campaigns.[11]

---

[8] Chris Kelly, *Trade Desk Revenue Up 24% As Advertisers Continue Shift to CTV, Retail Media*, MARKETINGDIVE (Feb. 15, 2023) https://www.marketingdive.com/news/trade-desk-earnings-q4-ctv-retail-media/642825/ (last visited Nov. 12, 2026).

[9] *See The Trade Desk Universal Pixel*, TEALIUM, https://tealium.com/integrations/the-trade-desk-universal-pixel/ (last visited Nov. 12, 2026).

[10] *See Universal Pixel*, OPENTTD, https://open.thetradedesk.com/advertiser/docsApp/GuidesAdvertiser/data/doc/TrackingTagsUniversalPixel (last visited Nov. 12, 2026).

[11] *See* Mason Widmer, *4 Vital Best Practices for Using The Trade Desk + A Top Tip*, GRAPESEED MEDIA (Nov. 6, 2024) https://grapeseedmedia.com/blog/trade-desk-best-practices/ (last visited Nov. 12, 2026).

51. The TTD Pixel, like other pixels, is a tracking tool that can be integrated with The Trade Desk's platform (the "Platform"). The TTD Pixel allows advertisers and site operators to "spend less time and effort placing tags, gain more visibility into user data, and analyze reporting at a more granular level… all with the placement of [a] single tag."[12] The TTD Pixel collects information, including demographics, browsing behavior, and conversion events.[13] The TTD Pixel is not limited to computer- or browser-based browsing; it is capable of collecting information from mobile platforms, including how a user interacts with mobile applications, and specific details regarding the mobile device being used to access the content and the applications.[14]

52. An advertiser or website operator that uses the Platform to run campaigns can leverage the TTD Pixel to collect data regarding how users interact across websites, mobile applications, television, and other technologies.[15]

---

[12] *Universal Pixel*, THETRADEDESK (2016) https://www.lockheedmartin.com/content/dam/lockheed-martin/eo/documents/contact/TTD_UniversalPixel_Overview.pdf (last visited Nov. 12, 2026).

[13] *See* Erin Jeffery, *What Are Pixels and Why Do I Need to Use Them?*, AX INSIGHTS (Sept. 3, 2020) https://audiencex.com/insights/what-are-pixels-and-why-do-i-need-to-use-them/ (last visited Nov. 12, 2026).

[14] *See Privacy and The Trade Desk Platform*, THETRADEDESK (last updated Mar. 13, 2026) https://www.thetradedesk.com/us/privacy (last visited Nov. 12, 2026).

[15] *See id.*

53. Defendant's integration of the TTD Pixel provides benefits to The Trade Desk and Defendant.

54. The first benefit provided by the TTD Pixel to The Trade Desk is data collection. This data allows The Trade Desk to segment user information to create target audiences and track conversions.[16] For example, the TTD Pixel enables The Trade Desk to collect user data, including demographic information, browsing behavior, preferences, and interactions with websites.[17] This data is then sent to an SSP, which analyzes bids from multiple DSPs, such as The Trade Desk, and facilitates the targeting of users based on their information.[18] The Trade Desk relies on this information for its business operations.

55. The TTD Pixel also enables The Trade Desk to retarget users by creating lookalike audiences, as the TTD Pixel is "essentially [] just storing a group of people and information about them."[19] A lookalike audience is a group of individuals who are likely to be interested in a business because they share similarities with the business's existing customers.[20] By developing lookalike audiences, The Trade Desk enhances its ability to bid for advertising space from

---

[16] *See* Jeffery, *supra* note 13.
[17] *See Privacy and The Trade Desk Platform*, *supra* note 14.
[18] *See Programmatic Advertising: Your Guide to DMPs, DSPs, and SSPs*, GROWTH MARKETING GENIE, https://growthmarketinggenie.com/blog/programmatic-advertising-dmps-dsps-ssps/ (last visited Nov. 12, 2026).
[19] Jeffery, *supra* note 13.
[20] *See id.*

SSPs by identifying website users who are more likely to generate clicks or conversions based on shared characteristics with existing customers.[21]

56. Finally, because The Trade Desk's primary business model involves charging clients a percentage of gross spending on The Trade Desk's platform, improvements in advertising effectiveness increase The Trade Desk's revenue. When advertising targeting efficiency improves by increasing advertising conversion rates (the rate at which clicks turn to sales),[22] advertisers are more likely to shift additional business to The Trade Desk, resulting in increased revenue derived from ad sales.[23]

57. Defendant's use of the TTD Pixel on the Website is shown in the screenshots below:

---

[21] *See id.*

[22] *See What Is a Conversion Rate (CVR)?*, ADJUST, https://www.adjust.com/glossary/conversion-rate/ (last visited Nov. 12, 2026).

[23] *See* Trevor Jennewine, *How Does The Trade Desk Make Money?*, THE MOTLEY FOOL (Oct. 27, 2021 7:35 AM) https://www.fool.com/investing/2021/10/27/how-does-the-trade-desk-make-money/ (last visited Nov. 12, 2026).




*Figure 6 – Sample Search page*




*Figure 7 – Inputting Search Terms into Search Bar results in TTD Pixel Intercepting the Search Terms*




*Figure 8 – The Payload of TTD Pixel on the website's search*




*Figure 9 – TTD Pixel's Cookies on the website's search*

## VII. The Yahoo DSP

58. Defendant installed advertising technology created by Yahoo Inc. ("Yahoo") on its Website.[24] Yahoo offers advertisers a demand-side platform (the "Yahoo DSP"), which Yahoo promotes as "the best platform to transform a combination of diverse and unique data sets into proven results."[25] Through the Yahoo DSP, advertisers can manage advertising campaigns across digitally connected media like television and podcasts.[26] Yahoo promotes the Yahoo DSP to advertisers with a figure of 625 million "Yahoo user profiles."[27]

59. Yahoo builds audiences for advertisers on the Yahoo DSP from its own data. Yahoo states that the Yahoo DSP's "curated audience segments are built using proprietary data, making it easy to target by behavior, interests, life stage, search, and many other categories," and that Yahoo offers "over 450 highly scaled and accurate audience segments."[28] Yahoo's identity product, Yahoo ConnectID, "is

---

[24] *See Yahoo Privacy Policy*, YAHOO! (last updated Mar. 2026) https://legal.yahoo.com/us/en/yahoo/privacy/index.html (last visited Nov. 13, 2026).

[25] *DSP Advertising*, YAHOO!, https://www.yahooinc.com/yahoo-dsp (last visited Nov. 13, 2026).

[26] *See Channels*, YAHOO!, https://www.yahooinc.com/yahoo-dsp (last visited Nov. 13, 2026).

[27] *See DSP Advertising*, *supra* note 25.

[28] *Platform*, YAHOO INC., https://www.yahooinc.com/yahoo-dsp/platform (last visited Nov. 13, 2026).

always active within Yahoo DSP" and "recognizes consumers across devices and channels."[29]

60. Yahoo collects information about users both on and off its own websites wherever its code is present. Yahoo states that it collects information "when you access content, advertising, sites, interactive widgets, applications, and other products (both on and off of our Services) where Yahoo data collection technologies (such as web tag, development tools, cookies and other technologies, etc.) are present."[30] This information includes "the sites or apps you used before accessing our Services and where you went next."[31] Through its tag, Yahoo collects information "about your online activities, such as the Service you are visiting, the address of the referrer page for the site you previously visited, the time you are visiting the Service, and your browsing or device settings."[32]

61. Yahoo also uses cookies to recognize users' browsers and devices. According to Yahoo, a cookie "may contain a device identifier for the purpose of

---

[29] *What Strong Data and Identity Actually Do For Your DSP Campaigns*, YAHOO! (Oct. 1, 2026) https://www.yahooinc.com/blog/what-strong-data-and-identity-actually-do-for-your-dsp-campaigns (last visited Nov. 13, 2026).

[30] *Welcome to the Yahoo Privacy Policy*, YAHOO! (last updated Mar. 2026) https://legal.yahoo.com/us/en/yahoo/privacy/index.html (last visited Nov. 13, 2026).

[31] *Id.*

[32] *Beacons & SDKs*, YAHOO!, https://legal.yahoo.com/us/en/yahoo/privacy/topics/webbeacons/index.html (last visited Nov. 13, 2026).

recognizing your browser as you interact with websites," and Yahoo uses cookies and device identifiers "to associate users, devices, and accounts with each other."[33] On third-party sites and apps, Yahoo uses cookies to "provide personali[z]ed advertising" and to "improve personali[z]ed advertising profiles," and Yahoo's "A3 cookie stores a unique identifier which [Yahoo] use[s] to display and measure advertising."[34]

62. Defendant's integration of the Yahoo DSP provides benefits to Yahoo. Yahoo states that "[a]dvertising is a core part of what we do at Yahoo."[35] Yahoo collects information about users' "online activities over time and across different websites and apps" to "make predictions about what products or services might be of interest to you in the future," and, based on those predictions, Yahoo and other companies "may categorize you as belonging to an audience to which advertisers may be interested in showing ads."[36] Yahoo "collects and maintains information about your interests based on your use of… other non-Yahoo sites, apps, and

---

[33] *Cookies and Similar Technologies*, YAHOO!, https://legal.yahoo.com/us/en/yahoo/privacy/topics/cookies/index.html (last visited Nov. 13, 2026).
[34] *Cookie Policy*, YAHOO! (last updated July 2023) https://legal.yahoo.com/ie/en/yahoo/privacy/cookies/previousversion-3-1/index.html (last visited Nov. 13, 2026).
[35] *Ad Serving*, YAHOO! (last updated Jan. 2026) https://legal.yahoo.com/us/en/yahoo/privacy/topics/adserving/index.html (last visited Nov. 13, 2026).
[36] *Id.*

services that we partner with" and "may combine this information with other information that we collect or receive about you."[37]

63. Yahoo may also use the data its code collects for its own purposes. Under Yahoo's pixel policy, Yahoo may use data collected by its code "in an aggregated, pseudonymous, or anonymous manner" "to build or improve services and offerings" and "to personalize content (including ads) [Yahoo] deliver[s]."[38] Yahoo's reporting tools for the Yahoo DSP let advertisers run reports on more than 200 types of data "dimensions," and Yahoo explains that "[a] dimension may represent an attribute of a consumer, segment, campaign, ad, or line."[39] These dimensions include the consumer's city and zip or postal code, as well as age and gender, for which "[a]ll data for this dimension is sourced from Yahoo."[40]

64. Defendant's use of the Yahoo DSP on the Website can be seen in the figures below.

---

[37] *Cookies and Similar Technologies*, *supra* note 33.
[38] *Yahoo Pixel and Custom Audience Policy*, YAHOO! (last updated Oct. 28, 2025) https://legal.yahoo.com/xw/en/yahoo/privacy/enterprise/pixelandcustomaudience/index.html (last visited Nov. 13, 2026).
[39] *Dimensions*, YAHOO! DSP, https://help.yahooinc.com/dsp-api/docs/dimensions (last visited Nov. 13, 2026).
[40] *Id.*




*Figure 10 – Yahoo SSP*[41] *capturing a user's Search communications with the Website*

[41] Though Yahoo shut down its supply-side platform in favor of its Yahoo DSP, its URLs retain the former "SSP" naming convention. *See Yahoo Shuts Down Its SSP | What It Means for Publishers*, ADNIMATION (Apr. 3, 2023) https://www.adnimation.com/yahoo-shuts-down-ssp/ (last visited Nov. 13, 2026).



*Figure 11 – Yahoo SSP capturing a user's Search communications with the Website*



*Figure 12 – Cookies of Yahoo SSP on the Search page of the Website*

## VIII. Google DoubleClick

65. DoubleClick for Publishers ("DoubleClick"), now known as Google Ad Manager,[42] allows website owners to track the performance of their ads across websites.[43] DoubleClick "acts as a liaison between a [website owner's] ad inventory, relevant ad networks," and website owners that are "looking to purchase ad space on a website."[44]

66. DoubleClick allows companies to buy online advertising and impressions through the DoubleClick Ad Exchange.[45] A DoubleClick account requires the use of a corresponding Google AdSense account.[46] DoubleClick is typically used for large-scale advertising, as the DoubleClick Ad Exchange connects and aggregates website owners and advertisers.

67. The DoubleClick Ad Exchange connects buyers and sellers of ad space in real time. When a page with an ad space loads, also known as an impression,

---

[42] *See* Brock Munro, *DoubleClick for Publishers: Everything You Need to Know*, PUBLIFT (last updated Oct. 8, 2026) https://www.publift.com/blog/what-is-googles-dfp-first-look (last visited Nov. 12, 2026) ("While [DoubleClick for Publishers ("DFP")] was rebranded as Google Ad Manager (GAM) several years ago, it is often still referred to as DFP within the ad tech industry.").

[43] *See* Shubham Grover, *DFP Glossary: An Easier Explanation for All the Jargon*, ADPUSHUP BY GENIEE (Dec. 10, 2022) https://www.adpushup.com/blog/dfp-glossary-easier-explanation-jargon/ (last visited Nov. 12, 2026).

[44] Munro, *supra* note 42.

[45] *See The DoubleClick Ad Exchange*, GOOGLE, https://static.googleusercontent.com/media/www.google.com/en//adexchange/AdExchangeOverview.pdf (last visited Nov. 12, 2026).

[46] *See* Grover, *supra* note 43.

buyers and sellers are connected in a real-time auction for that space.[47] This value can be based on the content of the page and the characteristics of the audience.

68. Defendant sends users' page views to Google as depicted below:




*Figure 13 – Google DoubleClick capturing a user's communications with the Website*

[47] *See The DoubleClick Ad Exchange*, *supra* note 45.




*Figure 14 – Payload of Google DoubleClick capturing a user's communications with the Website*




*Figure 15 – Cookies of Google DoubleClick capturing a user's communications with the Website*




*Figure 16 – Google DoubleClick capturing a user's Search communications with the Website*




*Figure 17 – Payload of Google DoubleClick capturing a user's Search communications with the Website*




*Figure 18 – Cookies of Google DoubleClick capturing a user's Search communications with the Website*

69. The bidding system functions in multiple steps. First, Google Ad Manager has various fee structures that can be utilized, including a percentage of spend plus a flat monthly fee, a flat monthly fee or percentage of spend, whichever is higher, or a flat fee percentage based on the amount you spend every month. Regardless of the structure, Google earns revenue by allowing website owners to use its code to display ads purchased through the DoubleClick Ad Exchange.

70. DoubleClick ads are based on the Google Ads bidding process. In connection with searches using AdSense, publishers, such as Defendant, receive a percentage of the revenue recognized by Google.[48]

71. The DSID cookie is used by Google to link individual users with advertising and analytic events.[49] This allows Google to link the intercepted communications with specific users. The IDE cookie is used to personalize advertising for a visitor and helps Google access their user profile and interests to serve them advertisements.[50]

72. While a normal user can only view the DoubleClick events through developer tools, advertisers and website owners[51] such as Defendant are able to view these events in an aggregated and easily readable format. Google provides DoubleClick users, such as Defendant, with a dashboard where they can view the information tracked and captured by Google AdSense.

---

[48] *See AdSense Revenue Share*, GOOGLE, https://support.google.com/adsense/answer/180195?hl=en (last visited Nov. 12, 2026).

[49] *See How Google Uses Cookies*, GOOGLE PRIVACY & TERMS, https://policies.google.com/technologies/cookies?hl=en-US&client_theme=dark (last visited Nov. 12, 2026).

[50] *See id.*

[51] *See About The Migration to Interactive Reports*, GOOGLE, https://support.google.com/admanager/answer/16071282?sjid=15404833465464052848-NA#about-interactive-reports&zippy=%2Cupdates-based-on-your-feedback-q%2Ccan-i-provide-feedback-about-the-new-interactive-reports-tool (last visited Nov. 12, 2026).

## IX. ScorecardResearch

73. ScorecardResearch is a service of Full Circle Studies, Inc., a subsidiary of the Comscore, Inc. market research company.[52] ScorecardResearch describes itself as "a leading global market research effort that studies and reports on Internet trends and behavior."[53] ScorecardResearch states that it "conduct[s] research by collecting Internet web browsing data and then use[s] that data to help show how people use the Internet, what they like about it, and what they don't."[54] ScorecardResearch offers two ways to collect data for website operators and others wishing to utilize its technology: (1) surveys, and (2) web tagging using the ScorecardResearch web tags.[55]

74. The ScorecardResearch web tags are offered to website operators that wish to take part in the company's market research. A company that elects to take part in such market research would place ScorecardResearch web tags into its website code. The ScorecardResearch Privacy Policy states that its web tags will collect information including: (1) "online identifiers (e.g., cookie ID, device ID, IP address, etc.)," (2) "geolocation information (inferred from [the] IP address)," and

---

52 *See* *Welcome*, SCORECARD RESEARCH, https://www.scorecardresearch.com/Home.aspx (last visited Nov. 13, 2026).
53 *Id.*
54 *Id.*
55 *See* *About*, SCORECARD RESEARCH, https://www.scorecardresearch.com/Home.aspx (last visited Nov. 13, 2026).

(3) "[i]nternet or other electronic network activity including information about [users'] browsing history, operating system, browser type, website preferences, [] use of the website or application on which the Tags have been implemented (e.g., time accessed, duration of visit, etc.)."[56] The data collected by ScorecardResearch is stored "for as long as is reasonably necessary for the purposes listed above or as required by applicable local law."[57] According to Comscore, such data is shared "with (i) our customers, including Google, which include media companies, brands, public relations companies, advertising networks, data analytics providers, distribution partners, social networks, marketing and advertising agencies; and (ii) joint industry committees ("JICs") involved in media audience measurement and research in a particular region, or parties engaged by these JICs. Such parties may combine your data with other data which they have at their disposal."[58]

75. ScorecardResearch intercepts the page views of a visitor on the Website, as depicted below:

---

[56] *See Privacy Policy*, SCORECARD RESEARCH, https://www.scorecardresearch.com/privacy.aspx?newlanguage=1 (last visited Nov. 13, 2026).

[57] *Id.*

[58] *Privacy Policy*, COMSCORE (last updated July 1, 2026) https://www.comscore.com/About/Privacy-Policy (last visited Nov. 13, 2026). ScorecardResearch refers visitors seeking more information about the privacy and security of visitors' personal information to Comscore's privacy policy. *See About*, supra note 55.




*Figure 19 – The Scorecard Beacon capturing a user's communications with the Website post-cookie rejection*




*Figure 20 – Information sent when the Scorecard Beacon captures a user's communications with the Website post-cookie rejection*

76. When websites utilize ScorecardResearch web tags, ScorecardResearch derives a principal benefit in the form of revenue earned through the commercialization and sale of the data collected through those beacons in its product offerings. As noted in its Privacy Policy, ScorecardResearch: "use[s] the collected information to prepare analyses and reports regarding digital consumption behavior that we share with other businesses and organizations which are our customers. These reports help our customers meet their business goals by providing them with a better understanding of digital consumption behavior, trends, and consumer preferences."[59] ScorecardResearch further states that the information obtained is also used by Comscore, "whose data are routinely cited by major media outlets such as The New York Times®, The Wall Street Journal®, and CNN®. The data are extensively relied upon by some of the world's largest media companies, advertisers and film studios and its strategic partners include the most important players in the TV and digital media and advertising ecosystem."[60]

77. ScorecardResearch engages in data tracking and sharing for the purpose of improving its products and services and assisting in the operation of its business. Through the continued collection and use of data obtained from website users, Comscore and ScorecardResearch are able to strengthen and expand their

[59] *Privacy Policy*, *supra* note 56.
[60] *Id.*

product offerings. Those enhanced offerings permit further investment in technologies designed to track user behavior and to commercialize that information through sales to business partners.

78. The information collected from the Website through ScorecardResearch tracking technologies, and later sold, is important to both ScorecardResearch and Comscore. It allows each to offer products and information to their clients and to derive revenue from those offerings.

79. ScorecardResearch tracking technologies provide Defendant with the ability to measure user behavior on and across the Website, identify behavioral trends, and use that information to more effectively deliver targeted advertising.[61] As stated in the ScorecardResearch Privacy Policy, its web tags and cookies assist websites in counting users who have visited and viewed a webpage or portions of a webpage.[62] More effective consumer targeting on the Website increases Defendant's revenues. Under standard online marketing practices, Defendant receives a share of advertising revenue generated from ad conversions.

---

[61] *See id.*
[62] *See id.*

### X. The Tracking Tools Listed Above Intercepted and Disclosed Both the Contents of Plaintiff's Communications With the Website, As Well as Plaintiff's Personal Identifiers

80. Plaintiff had a reasonable expectation that the following information would not be exposed to the Tracking Tools placed by Defendant: (i) Plaintiff's identifying information, (ii) information that designated Plaintiff as interested in purchasing Defendant's products, and (iii) IP address and identifier information relating to who Plaintiff is, and who Plaintiff was communicating with.

81. When Plaintiff, among others, viewed the weather for San Diego, Miami, and Rome, bookmarked the San Diego page, searched for Miami and Rome, and viewed current conditions, the weather advisory, and radar, the Tracking Tools contemporaneously intercepted Plaintiff's communications, which is reflected and can be seen in the Transmitted URLs. The path and query string of these Transmitted URLs reflect the substance of a user's communication and therefore constitute content.

82. The Tracking Tools also intercepted and disclosed Plaintiff's and Defendant's IP addresses, Defendant's personal identifiers for each Tracking Tool, and the cookies that individually identified Plaintiff.

83. This interception, duplication, and transmission occurred inside Plaintiff's browsers, before the communications fully reached users' devices, or before they were transmitted from users' devices, and therefore occurred while the

communications were in transit, intercepted, read, duplicated, and retransmitted by the Tracking Entities, who were third parties to Plaintiff's communications with Defendant.

## XI. Plaintiff Did Not Consent to Third-Party Tracking

84. The Website's default settings permitted tracking to begin as soon as users arrived on the Website, before users could select "Reject All" or "Accept All" on the Cookie Settings or access "Customize Settings" to manage their cookie selections.

85. Even when Plaintiff did reject "Targeted Advertising" cookies when confronted with the Privacy Banner and Cookie Settings, Defendant placed, and allowed to be placed, the A3 cookie from Yahoo, the TDID cookie from The Trade Desk, and the IDE cookie from Google, which identified Plaintiff on the Website and intercepted Plaintiff's communications in real time.

86. When Plaintiff rejected "Targeted Advertising" cookies, Plaintiff relied on Defendant's representation that "Targeted Advertising" cookies would not be placed and would not continue to track Plaintiff on the Website. Plaintiff continued to browse and use the Website in reliance on that representation.

87. Defendant promised in the Cookie Settings that Plaintiff could reject the A3 cookie from Yahoo, the TDID cookie from The Trade Desk, and the IDE

cookie from Google, yet continued to place and use those cookies after Plaintiff rejected "Targeted Advertising" cookies.

88. The figures below are exemplar images taken during counsel's investigation of the Website to show post-rejection tracking and cookies on the Website by an example browser.




*Figure 21 – Post-rejection Yahoo tracking on the Website*




*Figure 22 – The Payload of Post-rejection Yahoo tracking on the Website*




*Figure 23 – Post-rejection Yahoo cookies on the Website*




*Figure 24 – Post-rejection TTD tracking on the Website*




*Figure 25 – The Payload of Post-rejection TTD tracking on the Website*




*Figure 26 – Post-rejection TTD cookies on the Website*




*Figure 27 – Post-rejection Google DoubleClick tracking on the Website*




*Figure 28 – The Payload of Post-rejection Google DoubleClick tracking on the Website*




*Figure 29 – Post-rejection Google DoubleClick cookies on the Website*

89. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class members suffered actual damages, including the loss of control over their personal information and the diminution in value of that information.[63] Plaintiff's and the Class members' Sensitive Information has concrete economic value, as

[63] *See Brown v. Google LLC*, No. 20-CV-03664-LHK, 2021 WL 6064009, at *14 (N.D. Cal. Dec. 22, 2021) (finding that "[p]laintiffs 'have suffered harm in the form of diminution of the value of their private and personally identifiable data and content'" through defendant's collection of plaintiffs' data); *see also Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 636 (N.D. Cal. 2021) (concluding that "plaintiffs who suffered a loss of their personal information suffered economic injury" and had standing sufficient to satisfy statutory requirements of economic injury).

shown by the robust market in which such data is bought, sold, and licensed.[64] Through its Privacy Banner and Cookie Settings, Defendant represented that users could reject "Targeted Advertising" cookies, thereby preserving the security and value of their Sensitive Information. Plaintiff relied on that representation and affirmatively rejected "Targeted Advertising" cookies. By facilitating the Tracking Entities' interception, collection, and transmittal of Plaintiff's Sensitive Information to the Tracking Entities, Defendant took for itself and its partners the value of that information without consent or compensation. Defendant also stripped Plaintiff of the ability to decide whether, when, to whom, and on what terms Plaintiff's Sensitive Information would be shared and/or sold.

90. Plaintiff values the privacy and exclusivity of Plaintiff's Sensitive Information. It is plausible, and indeed likely, that Plaintiff would at some point have monetized Plaintiff's data by selling or licensing it through one of the many

[64] *See* Order Denying Google's Motion for Summary Judgment at 33, *Brown v. Google LLC*, No. 4:20-cv-03664-YGR, ECF No. 969, 2023 U.S. Dist. LEXIS 139895 (N.D. Cal. Aug. 7, 2023) (finding a Google pilot program paying users for access to their browsing history sufficient to establish the existence of a market for users' personal data); *see also* Madison Mills, *Exclusive: Verb Lets You Sell Your Data to AI Labs for Training*, AXIOS (Aug. 6, 2026) https://www.axios.com/2026/08/06/exclusive-verb-lets-you-sell-your-data-to-ai-labs-for-training (last visited Nov. 5, 2026) (describing operations for data exchange marketplace startups Verb, Mercor, and Vana, which enable users to sell personal data as training data); Megan Morrone, *Exclusive: New Wallet App Lets Users Store Their Own Training Data*, AXIOS (Sept. 22, 2025) https://www.axios.com/2025/09/22/ai-training-data-vana-app-mit (last visited Nov. 5, 2026) (similar).

available channels.[65] Defendant's unauthorized dissemination has foreclosed or diminished that opportunity, because data that has already been captured and distributed to third parties without restriction commands a lower price, or no price at all, in that market. Plaintiff therefore lost the benefit of Plaintiff's bargain, lost the exclusive value of Plaintiff's Sensitive Information, and did not receive the privacy protections Defendant promised.

91. A well-developed market exists in which consumers are compensated for access to their browsing and online activity data.[66] Because Defendant and its third-party partners have already obtained Plaintiff's information without authorization, any prospective purchaser of that information would pay less for it, or would not pay for it at all, since the information is no longer exclusive to Plaintiff.

## **TOLLING**

92. The statutes of limitations applicable to Plaintiff's and the Class members' claims are tolled by Defendant's wrongful conduct and by Plaintiff's and the Class members' delayed discovery of their claims. Defendant's acts were technically complex and inherently self-concealing, thereby preventing Plaintiff and the Class members from discovering the unlawful disclosure of their Sensitive Information until recently.

---

[65] *See* Mills, *supra* note 64; *see also* Morrone, *supra* note 64.
[66] *Id.*

93. Defendant, via its Privacy Banner and Cookie Settings, misrepresented its data sharing practices.

94. Defendant possessed superior and exclusive knowledge that the TTD Pixel, the Yahoo DSP, DoubleClick, and the ScorecardResearch web tags embedded within its Website would disclose Plaintiff's and Class members' Sensitive Information in contradiction to Plaintiff's cookie settings preferences.

95. Plaintiff and the Class members could not, through the exercise of reasonable diligence, have discovered the full scope of Defendant's conduct and misrepresentations because the technology involved is highly technical and not reasonably discernible to ordinary users.

96. Plaintiff and the Class members first became aware of Defendant's misconduct as a result of counsel's investigation and technical analysis conducted in advance of filing this Complaint, on or about November 11, 2026.

## **CLASS ALLEGATIONS**

97. Plaintiff brings these claims for relief pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of the Class and the California Subclass.

98. Plaintiff brings this class action individually and on behalf of the following Class:

> All persons in the United States who visited the Website during the applicable limitations period and selected "Reject All" in the Website's Cookie Settings or otherwise declined cookies other than "Analytics" and "Essential Services" (the "Class").

99. Plaintiff brings this class action individually and on behalf of the following California Subclass:

> All members of the Class who visited the Website during the applicable limitations period while located in the State of California (the "California Subclass").

100. Specifically excluded from the Class are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

101. Plaintiff reserves the right to amend the Class and Subclass definitions above if further investigation and/or discovery reveal that the Class should be expanded, narrowed, further divided into subclasses, or otherwise modified in any way.

102. NUMEROSITY: At this time, Plaintiff does not know the number of Class members but believes the number to be at least measured in thousands, if not millions, given the popularity of Defendant's Website. The number of persons within the Class is believed to be so numerous that joinder of all members is impractical. The exact identities of Class members may be ascertained via the records maintained by Defendant in the ordinary course of its business.

103. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between the Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant shared the Class members' Sensitive Information with the Tracking Entities or other third parties and/or facilitated the Tracking Entities' interception of the Class members' Sensitive Information;

b. Whether Defendant obtained effective and informed consent to do so;

c. Whether Defendant's conduct constitutes a violation of the Wiretap Act;

d. Whether Defendant's conduct constitutes unlawful intrusion upon seclusion;

e. Whether Defendant's conduct constitutes fraud;

f. Whether Defendant has been unjustly enriched by its conduct; and

g. Whether the Class members are entitled to actual damages, punitive damages, and/or statutory penalties.

104. Common questions of fact and law exist as to all California Subclass members and predominate over any questions affecting only individual members of the California Subclass. Such common legal and factual questions, which do not vary between the California Subclass members, and which may be determined without reference to the individual circumstances of any California Subclass member, include but are not limited to the following:

a. Whether Defendant's conduct constitutes a violation of the CIPA; and

b. Whether Defendant's conduct constitutes a violation of the California Constitution.

105. TYPICALITY: As a person who visited Defendant's Website and whose personal information was shared by Defendant without consent, Plaintiff is asserting claims that are typical of the Class members.

106. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class members or whose inclusion would otherwise be improper are excluded.

107. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class members is impracticable and inefficient. It would be unduly burdensome on the courts, where individual litigation of numerous cases would proceed. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE WIRETAP ACT, 18 U.S.C. § 2510 et seq.
### (On Behalf of Plaintiff and the Class)

108. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

109. Plaintiff brings this cause of action individually and on behalf of all Class members.

110. The federal Wiretap Act prohibits the intentional interception of any wire, oral, or electronic communication without the consent of at least one authorized party to the communication. *See* 18 U.S.C. § 2511.

111. The Wiretap Act provides a private right of action to "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

112. The Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

113. The Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

114. The Wiretap Act defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

115. The Wiretap Act defines "person" to include any individual, partnership, association, trust, or corporation. 18 U.S.C. § 2510(6).

116. Plaintiff, Defendant, and the Tracking Entities are "persons" within the meaning of the Wiretap Act.

117. The Tracking Tools, Plaintiff's devices and browsers, and Defendant's website server constitute "device[s]" or "apparatus[es]" capable of intercepting wire, oral, or electronic communications within the meaning of 18 U.S.C. § 2510(5).

118. Plaintiff had a reasonable expectation of privacy in Plaintiff's electronic communications with Defendant's Website, including the pages Plaintiff

viewed, browsing activity, and other interactions with Website features, particularly where Defendant represented through its Privacy Banner and Cookie Settings that users could reject all advertising cookies.

119. Within the relevant time period, Plaintiff's electronic communications with the Website were intercepted contemporaneously at the moment they were collected by the Tracking Tools and transmitted to Tracking Entities without Plaintiff's consent from Plaintiff's browser, for the unlawful purpose of monetizing Plaintiff's intercepted information, including for combining that information with information collected about Plaintiff from across the Internet via the same Tracking Tools and used for advertising, analytics, and marketing optimization.

120. Interception occurred whenever Plaintiff interacted with the Website, including when Plaintiff navigated webpages, viewed content, or otherwise communicated information to the Website through Plaintiff's browsers.

121. At all relevant times, Defendant's conduct was knowing, willful, and intentional. Defendant is a sophisticated commercial entity that knowingly embedded and enabled the Tracking Tools on its Website and understood that doing so would result in the interception and transmission of users' communications to the Tracking Entities.

122. Plaintiff did not consent to the interception, recording, disclosure, or use of Plaintiff's electronic communications with the Website by the Tracking

Entities. To the contrary, Plaintiff affirmatively rejected "Targeted Advertising" cookies through Defendant's Cookie Settings.

123. The unauthorized interception and use of Plaintiff's electronic communications by the Tracking Entities were only possible because Defendant knowingly and intentionally placed and enabled the Tracking Tools on the Website. *See* 18 U.S.C. § 2511(1)(a).

124. Defendant intentionally procured the Tracking Entities' interception of the contents of Plaintiff's and the Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state. Defendant engaged in such conduct for unlawful and tortious purposes, including, for example, invasion of privacy, and associating the content of Plaintiff's and the Class members' electronic communications with preexisting consumer profiles and using the contents of their electronic communications in a manner that exceeds what Defendant promised Plaintiff and the Class members on its Website.

125. Additionally, Plaintiff's communications were fraudulently disclosed and were obtained and used based on misrepresentations to Plaintiff through the Cookie Settings.

126. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is

intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

127. As a direct and proximate result of Defendant's violations of the Wiretap Act, Plaintiff has been damaged and is entitled to relief under 18 U.S.C. § 2520, including:

a. damages in an amount to be determined at trial, assessed as the greater of the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation, or

b. statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000; and

c. a reasonable attorney's fee and other litigation costs reasonably incurred.

**<u>COUNT II</u>**
**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Penal Code § 631**
**(On Behalf of Plaintiff and the California Subclass)**

128. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

129. Plaintiff brings this cause of action individually and on behalf of all California Subclass members.

130. CIPA provides that a person is liable to another where, "by means of any machine, instrument, or contrivance, or in any other manner," committed any of the following: (i) intentionally tapped, or made any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system; or (ii) willfully and without consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or being sent from or received at any place within this state; or (iii) uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained; or (iv) aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit or cause to be done any of the acts or things mentioned above in this section. Cal. Penal Code § 631(a).

131. The Website, the Tracking Tools, and Plaintiff's devices and browsers each qualify as a "machine, instrument, or contrivance, or… other manner" used to engage in the prohibited conduct at issue here. Cal. Penal Code § 631(a).

132. Within the relevant time period, the Tracking Entities, through the use of the Tracking Tools, without the consent of all parties to the communication, or

in any unauthorized manner, willfully read or attempted to read or learn the contents or meaning of electronic communications of Plaintiff and the California Subclass members, contemporaneous with the communications transiting through or passing over any wire, line or cable or with the communications sent from or being received at any place within California.

133. The information collected by the Tracking Tools was not for the sole benefit of Defendant. Within the relevant time period, Defendant aided, agreed with, and employed the Tracking Entities to accomplish the wrongful conduct at issue here.

134. Plaintiff and the California Subclass members did not authorize or consent to the tracking, interception, and collection of any of their electronic communications. Defendant's violations of Cal. Penal Code § 631 constitute invasions of privacy of Plaintiff's and the California Subclass members' respective rights to privacy.

135. As a direct and proximate result of Defendant's conduct, Plaintiff and the California Subclass members suffered losses and were damaged in an amount to be determined at trial. CIPA imposes civil liability and statutory penalties for violations of Cal. Penal Code § 631. *See* Cal. Penal Code § 637.2.

**COUNT III**
**INVASION OF PRIVACY AND**
**VIOLATIONS OF THE CALIFORNIA CONSTITUTION, Art. 1, § 1**
**(On Behalf of Plaintiff and the California Subclass)**

136. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

137. Plaintiff brings this cause of action individually and on behalf of all California Subclass members.

138. Article I, Section 1 of the California Constitution provides: "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Const. art. I, § 1.

139. California voters added the words "and privacy" to the California Constitution when they passed Proposition 11 in 1972. Proposition 11 is also known as the "Privacy Initiative" or "Right to Privacy Initiative." In support of Proposition 11, Assemblyman Kenneth Cory and State Senator George Moscone stated: "[t]he right of privacy is the right to be left alone…. It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of

personal information. This is essential to social relationships and personal freedom."[67]

140. Plaintiff and the California Subclass members have a legally protected interest in their Sensitive Information, such as browsing activity, device identifiers, and related metadata, which Defendant violated by providing the Tracking Entities access to that data, enabling the interception of such communications.

141. Plaintiff's and the California Subclass members' protected interests arise from various statutes and common law, including, *inter alia*, the Wiretap Act, the CIPA, and the California Constitution, which protects privacy rights and includes the "ability to control circulation of personal information."[68]

142. The privacy rights of Plaintiff and the California Subclass members were invaded through the interception and collection of their data, which included their Sensitive Information and other sensitive information, without first obtaining authorization or consent from Plaintiff and the California Subclass members.

143. Plaintiff and the California Subclass members had a reasonable expectation of privacy when communicating with Defendant's Website and thereby providing and/or transmitting their Sensitive Information. By causing third-party cookies and the TTD Pixel, the Yahoo DSP, DoubleClick, and the

[67] Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972) argument in favor of Prop. 11 27.
[68] *Id.*

ScorecardResearch web tags to be placed on users' browsers and devices and by transmitting users' Sensitive Information to The Trade Desk, Yahoo, Google, and ScorecardResearch despite users' selections in the Cookie Settings, Defendant violated their reasonable expectation of privacy.

144. Defendant's intrusion, placing the TTD Pixel, the Yahoo DSP, DoubleClick, and the ScorecardResearch web tags and enabling third-party access to users' Sensitive Information despite users' express rejection of such tracking in the Cookie Settings, is and would be highly offensive to a reasonable person.

145. As a direct and proximate result of Defendant's intentional invasion of their privacy rights, Plaintiff and the California Subclass members have been harmed and are entitled to compensatory and punitive relief.

**COUNT IV**
**COMMON LAW INVASION OF PRIVACY**
**Intrusion Upon Seclusion**
**(On Behalf of Plaintiff and the Class)**

146. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

147. Plaintiff brings this cause of action individually and on behalf of all Class members.

148. Defendant intentionally intruded upon the legally protected privacy interests of Plaintiff and the Class members by, among other things, permitting Tracking Tools to intercept and use users' Sensitive Information by compiling it

with other user information gathered across the internet, while representing to users that they could decline such collection.

149. Plaintiff and Class members maintained a reasonable expectation that their communications with Defendant via the Website would remain private, specifically with respect to their personal information, including browsing activity, device identifiers, and related metadata, which has been recognized as sensitive information.[69] Plaintiff expected that Plaintiff's interactions with the Website would not be shared with third-party analytics providers.

150. Defendant's intrusion, placing the TTD Pixel, the Yahoo DSP, DoubleClick, and the ScorecardResearch web tags and enabling The Trade Desk, Yahoo, Google, and ScorecardResearch's access to users' Sensitive Information despite users' express rejection of such tracking in the Cookie Settings, is and would be highly offensive to a reasonable person.

151. Plaintiff and Class members relied on Defendant's representations and exercised the Website's controls to select "Reject All" in the Website's Cookie

[69] For example, California voted to pass the California Consumer Privacy Act of 2018 (the "CCPA") and voted to amend the CCPA in 2020 through Proposition 24, the California Privacy Rights Act (the "CPRA"). The CPRA sets out that collecting and using "personal information," including real names, online identifiers, internet browsing and search history, location data, audio and visual information, etc., requires businesses to provide adequate notice of such practices. *See generally* Cal. Civ. Code §§ 1798.100, 1798.105, 1798.106, 1798.110, 1798.115, 1798.120, 1798.140(v).

Settings or otherwise reject cookies other than "Analytics" and "Essential Services," reasonably expecting that Defendant would honor its affirmative representation in the Privacy Banner and Cookie Settings that users could decline to accept "Targeted Advertising" cookies.

152. Despite Plaintiff's and the Class members' affirmative rejection of "Targeted Advertising" cookies in the Cookie Settings, Defendant permitted The Trade Desk, Yahoo, Google, and ScorecardResearch to use cookies and the TTD Pixel, the Yahoo DSP, DoubleClick, and the ScorecardResearch web tags to collect and compile users' Sensitive Information, including the categories described above. The Trade Desk, Yahoo, Google, and ScorecardResearch used and profited from these data to create detailed user profiles, audience segments, and targeted advertising, and to share and monetize those profiles.

153. Defendant lacked any legitimate business justification for permitting the placement and transmission of third-party cookies and the TTD Pixel, the Yahoo DSP, DoubleClick, and the ScorecardResearch web tags that allowed The Trade Desk, Yahoo, Google, and ScorecardResearch to access, intercept, and collect users' Sensitive Information, contrary to users' express selections and rejection of consent in the Cookie Settings.

154. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class members suffered injury, including but not limited to loss of privacy, loss

of control over their personal information, diminution in value of their private data, and other compensable harms.

155. Plaintiff and the Class members seek all available relief for this claim, including compensatory damages, restitution, disgorgement of profits, and punitive damages where available.

## COUNT V
## COMMON LAW FRAUD, DECEIT, AND/OR MISREPRESENTATION
## (On Behalf of Plaintiff and the Class)

156. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

157. Plaintiff brings this cause of action individually and on behalf of all Class members.

158. Defendant made affirmative representations to users through its Privacy Banner and Cookie Settings. The Privacy Banner represented that "we respect your privacy and your right to control how we collect, use, and share your personal data." The Cookie Settings offered a "Reject All" control and described the "Targeted Advertising" purpose as the "Creation and activation of advertisements based on a profile informed by the collection and analysis of behavioral and personal characteristics; we may set cookies or other trackers for this purpose."

159. Defendant represented that exercising those options would limit or prevent the deployment of the TTD Pixel, the Yahoo DSP, DoubleClick, and the ScorecardResearch web tags, including marketing cookies, and would limit the transmission of users' Sensitive Information to The Trade Desk, Yahoo, Google, and ScorecardResearch.

160. Defendant made these representations at the time users first accessed the Website and again when users were prompted to review and confirm their cookie preferences. Plaintiff last visited the Website in or around October 2026 and rejected cookies.

161. These representations were false and misleading. Before users, including Plaintiff and the Class members, were able to decline all unnecessary cookies, and after Plaintiff and the Class members selected "Reject All" in the Website's Cookie Settings or otherwise rejected "Targeted Advertising" cookies, Defendant deployed the TTD Pixel, the Yahoo DSP, DoubleClick, and the ScorecardResearch web tags to intercept and collect Plaintiff's and the Class members' Sensitive Information and transmit the same to The Trade Desk, Yahoo, Google, and ScorecardResearch.

162. Defendant knew the representations were false or misleading, or acted with reckless disregard for their truth, because Defendant controlled the Website's source code, selected and configured the Tracking Tools, and determined how those

tools operated in relation to users' expressed privacy choices. Defendant also received reports on the Tracking Tools' functionality, which would have alerted Defendant to decreased information intake if the Website's Privacy Banner and Cookie Settings were functioning as described and stopped transmitting data when users rejected cookies.

163. Defendant had the technical ability to prevent data transmissions and to configure the Website so that non-essential tracking ceased when users declined such tracking. Industry-standard tools, configurations, and consent-management frameworks exist that permit websites to block, defer, or condition the loading of non-essential Tracking Tools based on users' preferences, and Defendant could have implemented such measures.

164. Defendant made misrepresentations with the intent to induce reliance by users, including Plaintiff, by reassuring them that they could meaningfully control tracking while Defendant continued to collect and transmit data for its own commercial benefit.

165. Plaintiff and the Class members reasonably and justifiably relied on Defendant's misrepresentations by continuing to use the Website and by affirmatively rejecting "Targeted Advertising" cookies instead of avoiding the Website, withholding information, or taking additional steps to protect their privacy.

166. Plaintiff's and the Class members' reliance was reasonable because Defendant presented the Privacy Banner and Cookie Settings as mechanisms for exercising legally protected privacy rights and for controlling the collection and sharing of personal information.

167. As a direct and proximate result of Defendant's fraudulent conduct, Plaintiff and the Class members suffered damages, including loss of privacy, loss of control over their personal information, and diminished value of their personal data. Plaintiff and the Class members suffered injury, including unauthorized disclosure of their communications, loss of control over their personal information, and loss of the privacy protection Defendant represented it would provide.

168. Defendant's conduct also resulted in Defendant obtaining an unjust and improper benefit by continuing to collect, use, and monetize users' Sensitive Information despite representing that such practices would cease upon users' declination and/or rejection of consent in the Cookie Settings.

169. Plaintiff and the Class members seek all available relief for Defendant's fraudulent conduct, including compensatory damages, restitution, disgorgement, and punitive damages where available.

## COUNT VI
## UNJUST ENRICHMENT
## (On Behalf of Plaintiff and the Class)

170. Plaintiff incorporates by reference and realleges each and every allegation set forth above in all preceding paragraphs of this Complaint.

171. Plaintiff brings this cause of action individually and on behalf of all Class members.

172. Defendant benefited by collecting, processing, and enabling third-party monetization of Plaintiff's and the Class members' Sensitive Information, which Defendant then used to increase the effectiveness of advertising, marketing, and sales and to generate revenue.

173. It is unjust that Defendant retains those benefits under circumstances in which the information was collected and transmitted in breach of the representations made to users and without valid consent.

174. Plaintiff and the Class members conferred these benefits on Defendant, and Defendant has been unjustly enriched at their expense. Equity and good conscience require restitution or disgorgement of the benefits unjustly retained by Defendant. Therefore, Plaintiff and the Class members are entitled to the relief set forth below.

## PRAYER

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a. For an order determining that this action is properly brought as a class action, certifying the Class and the California Subclass, and certifying Plaintiff as the representative of the Class and the California Subclass and Plaintiff's counsel as Class Counsel;

b. For an order finding in favor of Plaintiff, the Class, and the California Subclass, on all counts asserted herein;

c. An award of statutory damages or penalties to the extent available;

d. An award of punitive damages to the extent available;

e. For damages in amounts to be determined by the Court and/or jury;

f. For pre-judgment interest on all amounts awarded;

g. For an order of restitution and all other forms of monetary relief;

h. An award of all reasonable attorneys' fees and costs; and

i. Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Dated: November 17, 2026

Respectfully submitted,

*/s/ Eric Lechtzin*
Eric Lechtzin (PA ID # 62096)
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N-300
Newtown, PA 18940
Phone: 215-867-2399
Email: elechtzin@edelson-law.com

Mark S. Reich*
Christopher V. DeVivo*
Ellen Noteware*
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cdevivo@zlk.com
Email: enoteware@zlk.com

*Counsel for Plaintiff*

**Pro hac vice* forthcoming